FILED

2005 Mar-31  PM 03:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| SYNTHIA JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-03-JEO-1571-S |
| | ) | |
| UNIVERSITY OF ALABAMA HEALTH | ) | |
| SERVICES FOUNDATION, P.C., | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION</u>**

Before the court is the motion for summary judgment of defendant University of Alabama

Health Services Foundation (hereinafter "the defendant" or "UAHSF") on the claims of the

plaintiff, Synthia Johnson (hereinafter "the plaintiff" or "Johnson").  (Doc. 15).[1]  The plaintiff's

complaint alleges discrimination in violation of the American with Disabilities Act (hereinafter

"ADA").  (Doc. 1).  The plaintiff also filed an amended complaint adding a claim for retaliatory

discharge in violation of 25-5-11.1 of the Code of Alabama.[2]  (Doc. 13).   Having considered the

parties' arguments, and evidence in support thereof, along with the relevant case law, the court

finds that the defendant's motion is due to be granted for the reasons set out herein.

---

[1]References to "Doc. __" are to the documents as numbered by the clerk of court in the court's record of the case.

[2]Ala. Code 25-5-1 through 25-5-318 is Alabama's Workers' Compensation Statute.

## FACTUAL BACKGROUND[3]

The plaintiff began working at UAHSF's Selma Clinic in January 2000, as a Medical Assistant or Licensed Practical Nurse ("LPN").  (Johnson Dep. at p. 42).[4]  Beginning in December 2000, the plaintiff assumed additional responsibilities in the laboratory and received a pay increase.  (Johnson Dep. at pp. 56-57; Singer Aff. at ¶ 4, Ex. A).[5]  Although the plaintiff primarily worked in the laboratory, she continued to serve as a Medical Assistant on an as-needed basis, filling in for other nurses.  (Johnson Dep. at p. 61).  Johnson's duties while employed by UAHSF included, but were not limited to, calling patients to the exam room, getting their names off the computer, clearing them off the computer, getting vital signs from patients, and obtaining a general statement regarding the patient's condition.  (Johnson Dep. at pp. 42, 49-50).[6]

On August 15, 2000, the plaintiff underwent arthroscopic surgery on her right knee for a non-work-related injury.  (Johnson Dep. at pp. 68-69).  The plaintiff returned to work after her surgery without restriction and was able to perform all of her job duties.  (Johnson Dep. at pp. 68-70).  On August 30, 2000, the plaintiff suffered her first on-the-job injury when a patient fell on the plaintiff's right knee.  (Yeldell Dep. at pp. 30-31).[7]  Although the plaintiff did not miss

---

[3]The facts set out below are gleaned from the parties' submissions and they are viewed in a light most favorable to the non-moving party.  They are the "facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)."  *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[4]Johnson's deposition is located at document 17, tab 1 and document 20 in the court's record of the case.

[5]Singer's affidavit is located at document 17, tab 10 in the court's record of the case.

[6]At some point, the plaintiff received on-the-job training to use the clinic's computer system to add patients to the doctors' schedules and to search the computer for patient records.  (Johnson Dep. at pp. 62-65).

[7]Excerpts from Yeldell's deposition are located at document 17, tab 4.

2

any work as a result of this injury, she did see a doctor for treatment.  (Doc. 20 at Ex. 6).  On

February 21, 2001, the plaintiff again injured her knee at work when she twisted her knee and felt

it "pop."  (Johnson Dep. at pp. 70-72).  The plaintiff did not miss work as a result of either

incident and continued to perform her regular job duties.  (Johnson Dep. at pp. 71, 73-74, 87-88).

UAHSF sent its first report of injury regarding the plaintiff's August 30, 2000, injury to

its risk management carrier on May 22, 2001.  (Yeldell Dep. at p. 34).  Then, on June 15, 2001,

UAHSF sent the first report of injury regarding the February 27, 2001 work injury.  (Doc. 20 at

Ex. 7).  The plaintiff continued working with no lost time until June 8, 2001, when an MRI

revealed a potentially torn anterior cruciate ligament ("ACL").  (Johnson Dep. at pp. 74-76).  At

that time, the plaintiff's surgeon, Dr. Lester Littell, took her off work for a second knee surgery

and the plaintiff began receiving workers' compensation benefits.  (Johnson Dep. at pp. 76, 82,

109).

On July 13, 2001, the plaintiff underwent her second knee surgery.  (Johnson Dep. at p.

76).  Following her surgery, the plaintiff remained off work while she rehabilitated her knee.  In

early December 2001, Dr. Littell gave the plaintiff a 17% impairment rating to the right lower

extremity and released her to return to work full duty with no restrictions.  (Johnson Dep. at pp.

82-83).[8]  When the plaintiff returned to work on December 7, 2001, she continued to complain of

---

[8]In a note to Nancy Powell, the Administrative Associate at the Selma Clinic, an individual named Gail Pilkerton, the
identity of whom is unclear to the court, wrote:

> Talked to Debbie Moser about ee.  Had letter from Doctor - Release - "May return to full
> duty."  MMI 17% of leg AMA guidelines.
>
> Ee already saying "parts of job that I can't do."  Per JHB and my discussion with Nancy -
> if ee is released to full duty - she has to work.  If she does not, it becomes an employment
> issue – then call Jeannie Thomas.

(Doc. 20 at Ex. 8).

pain in her right knee.  (Johnson Dep. at p. 83).  The plaintiff worked December 7, 10, 11, and 12

and about three hours on December 13, 2001, before she consulted Dr. Littell.  (Singer Aff. at ¶¶

5, 6, Exs. B & C).  Dr. Littell saw nothing wrong with the plaintiff's knee at that time but

referred her for a second opinion and took her off work effective December 13, 2001.  (Johnson

Dep. at pp. 82-83; Singer Aff. at ¶ 6, Ex. C).  The plaintiff never returned to work at the Selma

Clinic.

The plaintiff sought a second opinion from Dr. Gaylon Rogers on December 20, 2001.

At that time, Rogers took her off work and scheduled an ACL repair and reconstruction for

January 10, 2002.  (Johnson Dep. at pp. 83-84; Doc. 20 at Ex. 12).  On January 22, 2002,

Johnson and her workers' compensation case manager, Pat Lee, went for an appointment with

Dr. Rogers.  Dr. Rogers released the plaintiff to return to work, but stated that she "must have a

seated position."[9]  (Johnson Dep. at DX5).[10]  After this visit, the plaintiff took her return to work

statement to the Selma Clinic and discussed it with Nancy Powell.  (Johnson Dep. at pp. 93-94).

The plaintiff told Powell that she would be willing to do anything. (Johnson Dep. at 134).

Powell consulted with Kathie Clark (Office Manager) and Nancy Yeldell Clinic Coordinator and

Johnson's immediate Supervisor) to determine if the Selma Clinic had any positions the plaintiff

could perform in a seated position.  (Johnson Dep. at p. 95; Powell Dep. at pp. 47-48, 56-57;[11]

---

[9]According to the plaintiff, a "seated job" was one that did not require her to be on her feet except to go to the restroom.  (Johnson Dep. at pp. 92-93).  The plaintiff identified the following positions as "seated" ones: receptionist, switchboard operator, and appointments clerk.  (Johnson Dep. at p. 152).

[10]According to UAHSF, it understood the plaintiff's job restriction to be temporary.  Pat Lee's role was to attend doctor's appointments with the plaintiff, obtain her treatment plan, coordinate and schedule treatment, and to communicate the work status to the employer.  On Lee's January 22, 2002 report, she noted that the plaintiff's restriction was temporary "until next visit."  (Singer Aff. at ¶ 7, Ex. D).

[11]Excerpts from Powell's deposition are located at document 17, tab 2 and document 20, tab 4 in the court's record of the case.

Clark Dep. at pp. 18, 20-21;[12] Yeldell Dep. at p. 21).  According to Powell, no positions were

available.  (Johnson Dep. at p. 94; Powell Dep. at pp. 47-48, 56-57; Clark Dep. at p. 21).

Johnson periodically called or visited the clinic to see if there were any seated positions available

and to turn in her return to work statements.  (Johnson Dep. at pp. 159, 206-07; Yeldell Dep. at

pp. 20-21; Powell Dep. at pp. 33-35).

On or about January 24, 2002, Lee communicated with Nancy Powell regarding the

plaintiff's work status in an attempt to get the plaintiff into a seated position.  Powell told Lee

that they had no available seated positions and Lee asked her to please let the plaintiff know if

any became available.  Lee understood that this agreement continued throughout the year 2002.

(Lee Dep. at pp. 30, 34-35).

On January 31, 2002, the plaintiff saw Dr. Rogers again.  (Johnson Dep. at p. 97).  She

told Dr. Rogers that the clinic did not have an available seated position so Dr. Rogers put her off

work "until further evaluation."  (Johnson Dep. at DX6).  Dr. Rogers told the plaintiff that if any

positions became available to let him know and he would release her to return to work.  (Doc. 20

at Ex. 12; Lee Dep. at pp. 82-88).[13]  At that point, UAHSF still understood the plaintiff's

condition to be temporary and that Dr. Rogers expected her to recover fully.  (Singer Aff. at ¶ 8,

Ex. E).

On March 18, 2002, Dr. Rogers released the plaintiff to work in a "seated job."  (Johnson

Dep. at DX7).  The plaintiff gave the return to work statement to Bill Cleveland, the Selma

---

[12]Excerpts from Clark's deposition are located at document 17, tab 3 and document 20, tab 5 in the court's record of the case.

[13]Excerpts from Lee's deposition are located at document 17, tab 5 and document 20, tab 2 in the court's record of the case.

Clinic Administrator, on March 15, 2002.  (Johnson Dep. at pp. 102-04, 131).  On that same day, the plaintiff asked either Cleveland or Powell whether there was "any position" available at the clinic that she could do and was told that no positions were available.  (Johnson Dep. at p. 131).

On March 28, 2002, one of the plaintiff's former co-workers told her that the Selma Clinic had an appointments clerk position available.[14]  On March 29, 2002, the plaintiff asked Powell about the vacancy and Powell told her the position had already been filled.[15]  (Johnson Dep. at pp. 136-38).  The position was filled by Pam Shipman on March 13, 2002.  (Shipman Aff. at ¶ 4).[16]  The plaintiff told Powell that she was willing to perform any position that became vacant at the clinic.  (Johnson Dep. at p. 134).

The plaintiff's next appointment with Dr. Rogers was on April 23, 2002, after which she was still restricted to a seated job.  (Johnson Dep. at DX10).  On April 25, 2002, the plaintiff delivered her return to work statement to the Selma Clinic and spoke with Cleveland and Powell about the recently filled PAR I position.  (Johnson Dep. at pp. 122, 125, 139-40).  Cleveland was upset and told the plaintiff that Pat Lee was upset with the clinic because it had not placed the plaintiff in the PAR I position.  Cleveland told the plaintiff that the clinic was "being nice by holding her job" and that she needed to watch what she said to worker's compensation because the carrier called the clinic and "chewed [somebody] out."  Powell and Cleveland then encouraged the plaintiff to apply for long term disability.  (Powell Dep. at pp. 64, 97).  Powell

---

[14]UAHSF does not have a position entitled Appointments Clerk.  For the purposes of this motion, it is undisputed that the position the plaintiff refers to is the Patient Account Representative I ("PAR I").

[15]Powell also told the plaintiff that she was not qualified for the PAR I position and that as long as she was under seated restrictions they had nothing for her.  (Johnson Dep. at pp. 133-34; 293).

[16]Shipman's affidavit is located at document 17, tab 7 in the court's record of the case.

told the plaintiff to "go home and [fill out the paperwork] now, and if you want to keep your job you will do what you are told." (Johnson Dep. at pp. 233-34). Cleveland also told the plaintiff that if she went into another position, she would not be a nurse anymore. (Johnson Dep. at p. 125).

By letter dated May 8, 2002, the plaintiff requested a transfer from her nursing position to a seated position. (Johnson Dep. at DX13). The plaintiff stated that "[t]his will only be a temporary change of job positions until the problem with my knee is resolved." (*Id.*).

On June 3, 2002, the plaintiff again inquired about any available positions at the Selma Clinic and was told there were no vacancies. (Johnson Dep. at p. 159). On June 4, 2002, the plaintiff again saw Dr. Rogers and he kept her restricted to a seated job. (Johnson Dep. at DX15).

By letter dated June 7, 2002, the plaintiff received information that she had been approved for long term disability benefits retroactive to September 6, 2001, pursuant to UAHSF's employee benefits program. (Johnson Dep. at DX14). Pursuant to UAHSF's normal practice, it notified the plaintiff that it was changing her employment status to "retirement due to disability" because she had been approved for long term disability benefits and was still unable to return to work. (Johnson Dep. at DX16). By the same letter, UAHSF explained to the plaintiff that it would no longer hold the plaintiff's position open for her, but she was free to apply for available positions whenever her doctor released her to return to work. (*Id.*). That same month, the plaintiff underwent two more procedures on her knee and Dr. Rogers instructed her to remain off work. (Johnson Dep. at pp. 160-61; Singer Aff. at ¶ 25, Ex. P).

On June 12, 2002, the plaintiff had arthroscopic surgery. (Johnson Dep. at p. 16). After

her June 2002 knee surgery, Dr. Rogers removed the plaintiff from work pending additional reconstructive surgery. (Doc. 20 at Ex. 12). Dr. Rogers performed surgery to repair Johnson's right knee ligament on June 24, 2002. (*Id*.). Thereafter, Dr. Rogers did not release the plaintiff to return to work until August 9, 2002, and then only for half days with restrictions. (Johnson Dep. at DX18).

On August 12, 2002, the plaintiff gave Cleveland a copy of her return to work statement and asked if the Selma Clinic had any jobs available within her restrictions. (Johnson Dep. at pp. 169-70). Cleveland replied that he thought she was on disability and understood that she was no longer employed by the clinic. (Johnson Dep. at pp. 166-69). Johnson responded that she had not been informed of that. (*Id*.). Cleveland told the plaintiff that they had no positions available and were experiencing personnel cutbacks related to the departure of some doctors. (Johnson Dep. at p. 171 and DX 17). He again told her that she could apply for any future vacancies. (Johnson Dep. at DX 17).[17]

On September 20, 2002, Dr. Rogers released the plaintiff to return to full duty without any restrictions following four weeks of physical therapy. (Johnson Dep. at pp. 175-76). Some time after this appointment, the plaintiff submitted an application with the Selma Clinic. (Johnson Dep. at pp. 176-77). The plaintiff spoke with Nancy Yeldell and Cleveland to update them on her work status. (Johnson Dep. at pp. 177-78). Cleveland informed her that the Selma Clinic was not hiring any nursing personnel at that time. (Johnson Dep. at p. 181).

---

[17]Cleveland and Powell questioned the cause of the plaintiff's injuries and Nancy Yeldell wondered whether the plaintiff's injuries were as severe as the plaintiff claimed. The rumor around the Selma Clinic was that people had seen the plaintiff driving her car and at the ballpark while on leave for her worker's compensation injury. At some point, a private investigator was hired by the clinic's workers' compensation carrier to follow the plaintiff. (Johnson Dep. at pp. 167, 173; Cleveland Dep. at p. 43; Powell Dep. at pp. 59-60, 67; Yeldell Dep. at pp. 40-43). Yeldell testified that others in the clinic wondered why they were having to cover the plaintiff's work while she was unable to work if she was able to drive and go to the ballpark. (Yeldell Dep. at pp. 99, 46, 52).

On September 23, 2002, the plaintiff filed a charge of discrimination with the EEOC alleging that UAHSF discriminated against her on the basis of her disability in violation of the ADA.  (Johnson Dep. at DX 22).  The EEOC issued a right to sue letter to the plaintiff on March 28, 2003.  (Singer Aff. at ¶ 26, Ex. Q).  The plaintiff then filed this lawsuit on July 16, 2003, alleging that UAHSF violated the ADA by not providing her a reasonable accommodation.  On January 26, 2004, the plaintiff amended her complaint to add a claim for retaliatory discharge[18] under Alabama Code 25-5-11.1.[19]

## MOTION FOR SUMMARY JUDGMENT

### Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided by trial.  Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact

---

[18]On August 13, 2003, the plaintiff entered into a settlement petition with UAHSF regarding her worker's compensation claim.

[19]On October 14, 2002, the plaintiff went to work as a Pharmacy Tech at Bryan Whitfield Hospital.  (Johnson Dep. at p. 184).  On November 1, 2002, Dr. Rogers allowed the plaintiff to return to work but restricted her to working only half days for thirty days.  (Doc. 20 at Ex. 12).  On November 25, 2002, Dr. Rogers removed a screw and washer from the plaintiff's right knee. (*Id.*).  By February 2003, the plaintiff was unable to continue work because she was on her feet too much of the day and was in pain while doing so.  (Johnson Dep. at p. 184).   Immediately thereafter, the plaintiff went to work for Southern Care Hospice where she was able to sit all day.  (Johnson Dep. at pp. 17-18, 194-97).  On March 27, 2003, Dr. Rogers gave the plaintiff the following permanent restrictions: no lifting greater than 40 pounds; minimal squatting; no crawling or climbing; infrequent use of ladders or stairs; no walking greater than 1 hour with 10 minute sitting breaks.  (Doc. 20 at Ex. 12).

that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id*.

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[T]he judges's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

## Discussion

### Disability Discrimination Under the ADA

The plaintiff alleges that the defendant discriminated against her in violation of the ADA

when it failed to provide her reasonable accommodation.  (Doc. 19 at 10).

The ADA states that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C.A. § 12112(a) (2000).  To establish a prima facie case of disability discrimination, the plaintiff "must demonstrate that she (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of her disability."  *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000), citing 42 U.S.C. § 12112(a) and *Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 910 (11th Cir. 1996); *Hilburn v. Murata Elecs. N. Am., Inc.,* 181 F.3d 1220, 1226 (11th Cir. 1999);

The familiar burden-shifting analysis of Title VII employment discrimination actions is applicable to the plaintiff's ADA claim.  *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996), *cert. denied*, 519 U.S. 1118, 117 S. Ct. 964, 136 L. Ed. 2d 849 (1997).  If the plaintiff is able to establish a *prima facie* case, the defendant will be afforded an opportunity to articulate its purported legitimate, nondiscriminatory reason for its action.  Once the defendant has proffered its legitimate, nondiscriminatory reason, the plaintiff may call the defendant's proffered reason into question by offering evidence that the defendant's stated reason is merely a pretext for unlawful employment discrimination.

As noted by the court in *Richio v. Miami-Dade County*, 163 F. Supp. 2d 1352, 1359 (S. D. Fla. 2001):

> . . . .  A crucial component in alleging discriminatory treatment by an employer based on conduct proscribed by the ADA, is proof of discriminatory motive.  *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 325

11

n.5, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977).

> In establishing unlawful motive, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). . . .

*Richio*, 163 F. Supp. 2d at 1359-60.

In the typical scenario, the initial inquiry is whether the plaintiff's medical condition constitutes a disability under the ADA. Indeed, in the instant case, the defendant argues that the plaintiff cannot establish a prima facie case because she has not shown that she has a disability within the meaning of the ADA.

### No disability within the meaning of the ADA

A disability is defined under the ADA and the pertinent regulations as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *see* 34 C.F.R. § 104.3(j)(1). Determining whether a plaintiff has a disability involves a three-step analysis:

> First, [the] plaintiff must be impaired. Next, the court must identify the life activity that the plaintiff claims has been limited and determine whether it is a major life activity under the ADA. . . . Finally, the court must determine whether the impairment "substantially limits" that life activity. The EEOC defines this phrase to mean "significantly restricted as to the condition, manner or duration under which the average person in the general population can perform the same major life activity." 29 C.F.R. § 1360.2(j)(1).

*Rossbach v. City of Miami*, 371 F.3d 1354 (11th Cir. 2004). The evidence is undisputed that the

plaintiff is impaired.[20]  The plaintiff alleges that she is substantially limited in the major life

activities of walking and standing.   (Doc. 19 at p. 12).   Also undisputed is the fact that walking

and standing are recognized major life activities.[21]  The court, however, finds that the plaintiff

has failed to show that she is "substantially limited" in the major life activities of walking and

standing.

> The Eleventh Circuit has noted as follows:
>
> Though our Court has not squarely addressed this issue, other courts have
> consistently held that someone who walks, sits, stands or sleeps "moderately
> below average" is not disabled under the Act.  *See, e.g., Kelly v. Drexel Univ.*, 94
> F.3d 102, 107 (3d Cir. 1996); *Harmon v. Sprint United Mgt. Corp.*, 264 F. Supp.
> 2d 964 (D. Kan. 2003); 29 C.F.R. app. § 1630.2(j). . . .*[S]ee also, Chanda v.
> Engelhard*, 234 F.3d 1219, 1222 (11th Cir. 2000) ("substantially limits" meant that
> "a diminished activity tolerance for normal daily activities such as lifting, running
> and performing manual tasks, as well as lifting restriction, did not constitute a
> disability under the ADA."); *Hilburn*, 181 F.3d at 1228 ("diminished activity
> tolerance" is not the same as substantial limitation).

*Rossbach*, 371 F.3d at 1358-59.  In the instant case, the plaintiff makes no assertion that she is

unable to do anything aside from work in a position where she is required to stand more than one

hour at a time.  She makes no allegation that she cannot perform chores around her house due to

her impairment, or that she cannot enjoy activities that she used to be able to enjoy.  The court

finds the reasoning of the District Court for the District of Kansas particularly helpful in this

case:

---

[20]The fact that the plaintiff was eligible for long term disability benefits is not sufficient to establish that she was "disabled" as that term is defined under the ADA.  The standards or disability under the ADA are different from the standards under the long term disability plan.  *Cf. Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999) (holding receipt of SSDI benefits does not automatically bar a plaintiff's ADA claim because the Social Security Act and the ADA have different qualification standards); *Taylor v. Food World, Inc.*, 133 F.3d 1419 (11th Cir. 1998) (same).

[21]The regulations interpreting the Rehabilitation Act of 1973 define major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  45 C.F.R. § 84.3(j)(2)(ii).

As provided by the EEOC regulations, "substantially limits" means "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which the average person in the general population can perform that same major life activity."  29 C.F.R. § 1630.2(j).  In determining whether a person is substantially limited in a major life activity, the court considers: "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent long term impact, or expected permanent or long term impact of or resulting from the impairment." *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999) (citations omitted), *petition for cert. denied*, 528 U.S. 811, 120 S. Ct. 45, 145 L. Ed. 2d 40 (1999). . . .

    "Substantial limitation" is not synonymous with "utter inabilit[y]." *Bragdon v. Abbott*, 524 U.S. 624, 118 S. Ct. at 2206. "When significant limitations result from the impairment, the definition is met even if the difficulties are not insurmountable."  *Id*.  But a "mere difference" in an individual's ability to perform a major life activity does not demonstrate a substantial impairment. *Albertsons, Inc. v. Kirkingburg*, 527 U.S. at ----, 119 S. Ct. at 2168. The ADA "concerns itself only with limitations that are in fact substantial." *Id*. The Third Circuit recently observed:

        The impairment must be severe when compared to the
        functioning of the general population. The purpose of the ADA
        would be undermined if protection could be claimed by those
        whose relative severity of impairment was widely shared. . . .

*Taylor v. Pathmark Stores, Inc*., 177 F.3d 180, 185-86 (3d Cir. 1999) (citation omitted).

    "The statutory requirement that disability determinations be made 'with respect to the individual, 'contemplates an individualized, and case-by-case determination of whether a given impairment substantially limits a major life activity of the individual." *Sutton v. United Air Lines, Inc*., 130 F.3d 893, 897 (10th Cir. 1997) (citations omitted), aff'd, 527 U.S. 471, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999). In short, the determination of a disability is made "on a case-by-case basis." *Albertsons, Inc. v. Kirkingburg*, 527 U.S. at ----, 119 S. Ct. at 2169. The Supreme Court in *Sutton* emphasized this point:

        The definition of disability also requires that disabilities be
        evaluated "with respect to an individual" and be determined based
        on whether an impairment substantially limits the "major life
        activities of such individual." § 12102(2). Thus, whether a person
        has a disability under the ADA is an individualized inquiry. *See*

14

> *Bragdon v. Abbott*, 524 U.S. 624, ----, 118 S. Ct. 2196, 141 L. Ed.
> 2d 540 (1998) (declining to consider whether HIV infection is a per
> se disability under the ADA); 29 C.F.R. pt. 1630, App. § 1630.2(j)
> ("The determination of whether an individual has a disability is not
> necessarily based on the name or diagnosis of the impairment the
> person has, but rather on the effect of that impairment on the life of
> the individual").

527 U.S. at ----, 119 S. Ct. at 2147. The court is not to speculate about a person's
condition "based on general information about how an uncorrected impairment
usually affects individuals, [but] rather . . . on the individual's actual condition."
527 U.S. at ----, 119 S. Ct. at 2147. The Supreme Court, however, also recognized
in *Albertsons* that "some impairments may invariably cause a substantial
limitation of a major life activity." 527 U.S. at ---, 119 S. Ct. at 2169 (citation
omitted).

Pointing principally at the workers' compensation impairment ratings for his foot,
McCleary mistakenly assumes that a permanent impairment to an extremity, by
itself, is necessarily a disability under the ADA.  *See Dutcher v. Ingalls
Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995); *Robinson v. Neodata*, 94 F.3d 499,
502 (8th Cir. 1996) (6% impairment rating "would have little, if any, effect on her
ability to perform major life activities"); *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 944
(10th Cir. 1994) (A 9% permanent partial disability rating to the right foot and a
29% permanent partial disability rating to the left foot was among the evidence
that the court commented "does little to show that Bolton is restricted from
performing a class of jobs."), *cert. denied*, 513 U.S. 1152, 115 S. Ct. 1104, 130 L.
Ed. 2d 1071 (1995). Because there is no dispute that McCleary has an impairment,
medical opinions merely expressing the same in conclusory terms are not
controlling nor necessarily significant in deciding whether a disability exists. *See
Dutcher*, 53 F.3d at 726.  Rather, the focus of the court's inquiry is whether the
evidence properly of record is sufficient for a reasonable jury to find that the
plaintiff's impairment substantially limited him in his activities of walking,
standing, or working.

McCleary does not come forth with sufficient detailed evidence to support any
substantial limitations on his capability to stand or walk as a result of his foot
injury. Admittedly, "[i]t is difficult, indeed perhaps not possible to draw a bright
line delineating the point at which a condition affecting an employee's ability to
walk can be regarded as a disability within the ADA." *Kelly v. Drexel University*,
94 F.3d 102, 108 (3d Cir. 1996); *see* 29 C.F.R. Pt. 1630, App. § 1630.2(j) ("[A]n
individual whose legs are paralyzed" or who "can only walk for very brief periods
of time" is substantially limited in the activity of walking). Still, the burden rests
with the plaintiff to offer more than conclusory and general statements about his

leg injury. "'Whether an impairment substantially limits a major life activity must be determined, not by how "disabling" the impairment sounds, but rather the impact of the impairment on the individual.'" *Ingles v. Neiman Marcus Group*, 974 F. Supp. 996, 1002 (S.D. Tex. 1997) (quoting *McKey v. Occidental Chemical Corp.*, 956 F. Supp. 1313, 1318 (S.D. Tex. 1997)); *see Aldrich v. Boeing Co.*, 146 F.3d 1265, 1270 (10th Cir. 1998), *cert. denied*, 526 U.S. 1144, 119 S. Ct. 2018, 143 L. Ed. 2d 1030 (1999).

That he wears a leg brace and experiences pain with excessive standing or walking is not enough evidence to allow a reasonable juror to conclude that the plaintiff's capacity for walking or standing is significantly restricted. *See, e.g., Taylor v. Pathmark Stores, Inc.*, 177 F.3d at 186-87 (Plaintiff's "ability to stand or walk is not significantly less than that of an average person" just because he requires ten-minute hourly breaks and walks with a slight limp); *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1025 (5th Cir. 1999) (As a result of one leg being shorter than the other and her foot being permanently flexed, the plaintiff "walk[s] with a limp and move[s] at a significantly slower pace than the average person," but this does not reach "the level of a substantial impairment"); *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997) (Walking with "moderate difficulty or pain . . . does not rise to the level of a disability") (collecting cases); *Kelly v. Drexel Univ.*, 94 F.3d at 109 (Plaintiff with "visible and apparent" limp who could not walk more than a mile, could not jog and had difficulty climbing stairs was not substantially limited in a major life activity) (collecting cases); *Brower v. Continental Airlines, Inc.*, 62 F. Supp. 2d 896, 902-03 (E.D.N.Y. 1999) (Expert's report stating that the plaintiff's foot bunions prevented "any extended walking or standing" showed the plaintiff experienced difficulty with walking but did not prove she was "disabled" under the ADA); *Miller v. Airborne Express*, 1999 WL 47242, at *5 (N.D. Tex. Jan. 22, 1999) (Following knee injury and surgery, the plaintiff was not substantially limited in his ability to stand though he preferred to lean on a rail and could stand only thirty minutes without resting); *Bochenek v. Walgreen Co.*, 18 F. Supp. 2d 965, 970 (N.D. Ind. 1998) (Knee problems after replacement surgery that caused numbness with prolonged sitting, that restricted walking to a few blocks without resting and that resulted in occasional pain did not constitute a substantial limitation on the activity of walking); *Ingles v. Neiman Marcus Group*, 974 F. Supp. at 1002 (Plaintiff was not disabled from walking despite numerous surgeries on both feet, the need to wear special types of footwear, and a restriction against extensive walking on hard surfaces); *Graver v. National Eng'g Co.*, No. 94-C-1228, 1995 WL 443944, at *9-11 (N.D. Ill. 1995) (Though he walked with a pronounced limp because of pain and stiffness in his ankles, the plaintiff was not significantly restricted in his ability to walk, care for himself, or work); *Richardson v. William Powell Co.*, No. C-1-93-528, 1994 WL 760695, at *3, *7 (S.D. Ohio, Nov. 10, 1994) (Degenerative arthritis in hip caused plaintiff to limp and to struggle climbing

16

stairs, but it did not interfere with a major life activity). "The EEOC's regulations define a person with a walking disability as someone who 'can only walk for very brief periods of time.' 29 C.F.R. § 1630.2(j) App; *cf. Deane* [*v. Pocono Medical Center*,] 142 F.3d [138] at 143 n.4 [ (3d Cir. 1998) ] (regulations are entitled to substantial deference)." Taylor, 177 F.3d at 186 ("fifty minutes (per hour) is not a 'very brief' period").

*McLeary v. National Cold Storage, Inc.*, 67 F. Supp. 2d 1288, 1299-1301 (D. Kansas 1999).

Likewise, the plaintiff in the instant case has not submitted sufficient evidence to prove that her impairment substantially limited a major life activity. Nothing in the record shows that the plaintiff's knee injury actually precludes her from accomplishing everyday tasks, or otherwise leading a normal life. Although the plaintiff's knee injury may have somewhat diminished her former physical capacities for standing and walking, there is no evidence that she is significantly restricted in those abilities as compared to the average person in the general population. As such, the court simply has no basis by which to find that she was substantially limited at the relevant time in the major life activities of standing and walking for purposes of the present claim.

Absent from the plaintiff's argument is the assertion that she is substantially limited in the major life activity of working. However, because the only limitation she articulates is the limitation of standing and walking in the workplace, the court deems it necessary to go through that analysis.

"To be substantially limited in the major life activity of 'working,' the individual must be significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes compared to the average person having comparable training skills and abilities. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278 (11th Cir. 1997); *Pritchard*, 92 F.3d at 1133; 29 C.F.R. § 1630.2(j)(3)(i). 'Although a plaintiff seeking recovery under the ADA, is not required to prove a comprehensive list of jobs which [he] cannot perform, the person must provide some evidence beyond the mere existence and impact of a physical impairment to survive summary judgment.' *Swain v. Hillsborough County School Bd.*, 146 F.3d 855, 858 (11th Cir. 1998). An impairment does not

substantially limit the ability to work merely because it prevents an individual from performing either a particular specialized job or a narrow range of jobs.  *Id.* Nor does the inability to perform a single, particular job constitute a substantial limitation in the major life activity of working.  *Id.*  'The inquiry is whether . . . the particular impairment constitutes for the particular person a significant barrier to employment.'  *Forrisi v. Bowen*, 794 F.2d 931, 933 (4th Cir. 1986); *see also Cash v. Smith*, 231 F.3d 1301, 1306 (11th Cir. 2000) ('To be substantially limited in the major life activity of working, an individual must be precluded from more than one type of job, even if the job foreclosed is the individual's job of choice.'); *Jasany v. United States Postal Service*, 755 F.2d 1244 (6th Cir. 1985) (postal clerk with mild case of crossed eyes that caused him to develop eye strain and headaches after operating a particular machine was not substantially limited in working because he was capable of working at other jobs within the post office); *Mustafa v. Clark County School Dist.*, 876 F. Supp. 1177 (D. Nev. 1995) (teacher whose anxiety disorder prevented him from working in a classroom was not substantially limited in his ability to work because he was not precluded from employment in general).

*Johnston v. Henderson*, 144 F. Supp. 2d 1341, 1351-52 (S.D. Fla. 2001).

In *Stedman v. Bizmart, Inc.*, 219 F. Supp. 2d 1212, 1220-21 (N.D. Ala. 2002), the court

stated as follows:

Prior to January 2002, case law made satisfaction of a prima facie case under the ADA, particularly meeting the "disability" prong, relatively simple.  On January 8, 2002, however, the Supreme Court significantly altered the definition of "substantially limits a major life activity."  *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002).

In *Toyota* the Supreme Court reversed the Sixth Circuit decision that found a former employee disabled because she could no longer perform all her manual tasks at work due to carpal tunnel syndrom. *See Toyota*, 534 U.S. at ----, 122 S. Ct. at 689.  Curtailing previous case law defining "major life activities," the Court held that "to be substantially limiting in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Id.*, 122 S. Ct. at 691.  Specifically, the Court stated that "[w]hen addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to

most people's daily lives, [22] not whether the claimant is unable to perform the tasks associated with her specific job." *Id.* at 693.

As a result, this decision creates additional obstacles for many plaintiffs in disability cases, particularly those alleging discrimination in the workplace. Under *Toyota* it appears that courts now have greater discretion in determining what is a major life activity and what interference with that activity is substantial enough to constitute a disability.

The court cannot find that the plaintiff is precluded from employment in general. To the contrary, the plaintiff is currently working as a hospice nurse. (Johnson Dep. at pp. 17-18, 194-97). The fact that the plaintiff is no longer able to work as a LPN is not sufficient for purposes of defining "disability" under the ADA. *See e.g., Sutton v. United Airlines, Inc.*, 527 U.S. 471, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999); *Rossbach*, 371 F. 3d at 1354. Instead, the plaintiff must show that she is precluded from working "a class of jobs or a broad range of jobs." This she has not done.

Therefore, because the plaintiff has failed to show that she is "substantially limited" in any major life activity, she cannot show that she is "disabled," [23] as that term is defined by the

---

[22]"The Court noted that testimony that the Toyota plaintiff could brush her teeth, wash her face, bathe, tend her garden, fix breakfast, do laundry, and pick up around the house was the very type of evidence the Sixth Circuit should have focused on, as these seemed the type of manual tasks of central importance to people's daily lives. *See Toyota*, 122 S. Ct. at 693." *Stedman*, 219 F. Supp. 2d at 1220 n.18.

[23]The defendant makes the argument that the plaintiff's impairment was temporary, and thus, not a disability as defined by the ADA. (Doc. 16 at p. 9). Specifically, the defendant argues that

When determining whether an impairment is substantially limiting, a court should consider the following three factors: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2)(i-iii).

Temporary or short-term impairments are not disabilities under the ADA. See, e.g. Barnes v. Reynolds Metals Co., 1999 U.S. Dist. LEXIS 9696, at *26 (N.D. Ala. 1999) (stating that "[a]n impairment temporary in nature cannot become a disability under the ADA"); cf. 29 C.F.R. 21 1630.2(j), Appx. (recognizing that temporary impairments are not disabilities). In Toyota Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), the Supreme Court held that an impairment's impact must be permanent or long-term for it to "substantially limit" the major life activities of an individual and thus qualify as a disability. 534 U.S. 184, 198 (2002). Accordingly, if an employee's impairment is temporary, the employer's obligations under the ADA, including providing a reasonable accommodation, are never triggered.

ADA.  Accordingly, she has failed to establish a *prima facie* case and her ADA claim is due to be

dismissed.[24]

_____

(Doc. 16 at pp. 9-10).  The defendant further contends that the plaintiff's impairment was nothing more than recuperation from surgery and that her recuperation period was only eight months.  (Doc. 16 at p. 10).  In response, the plaintiff merely asserts that she "is not arguing and is not making a claim and has never made a claim, nor is arguing now, that her disability was based on recuperation from surgery."  (Doc. 19 at 14).  While that may be the case, the defendant has presented the issue as a defense to the plaintiff's ADA claim and it is an argument that merits discussion.

In his medical provider statement to the worker's compensation carrier, Dr. Rogers noted that the plaintiff's prognosis for recovery was "good."  (Plaintiff's Dep. at DX12).  Further, in a letter to the defendant, the plaintiff represented that "[t]his will only be a temporary change of job position until the problem with my knee is resolved."  (Plaintiff's Dep. at DX13).

Absent any evidence that Dr. Rogers considered the plaintiff's impairment to be permanent at the time she was employed by the defendant, the plaintiff's impairment was arguably temporary, and perhaps properly characterized as "recuperation from surgery."  Because the court has already found that the plaintiff was not "disabled" as defined by the ADA, it need not make a finding as to whether the plaintiff's impairment was in fact recuperation from surgery or sufficiently short in duration so as to be "temporary," and, thus, not a disability as defined by the ADA.

[24]Alternatively, the defendant argues that even if the plaintiff could establish a disability under the ADA, it could not reasonably accommodate her by modifying her job and it did not have any vacant position to which it could reassign her.  (Doc. 16 at 14).  The plaintiff submits that several positions became available while she was restricted to a "seated job" that she could have performed given the opportunity.

Three of the positions the plaintiff alleges she could have performed were PAR I positions.  However, the defendant maintains that the PAR I position cannot be performed sitting down. The plaintiff argues that it can be. The first PAR I position the plaintiff complains about was filled by Julia "Annette" Buxton.  (Doc. 19 at p. 15).  The plaintiff alleges that Buxton became a PAR I on March 2, 2002.  Buxton, however, testified that she became a PAR I in December 2001, before the plaintiff's surgery. (Buxton Aff. at ¶ 3 located at document 17, tab 9 in the court's record of the case).

The next position, and the one the court finds most troubling, is a PAR I position that became available while the plaintiff was off work due to her impairment.  While the plaintiff was technically off work until further evaluation, viewing the facts in the light most favorable to the plaintiff, the defendant knew that Dr. Gaylon would lift her restrictions should a seated position become available.  Moreover, the defendant told the plaintiff's case manager that it would keep the plaintiff apprized of any potential position. Either way, the plaintiff did not learn of the PAR I position until after the defendant filled it.  Had the court determined that the plaintiff made a prima facie case of discrimination under the ADA, it likely would have found at least a factual dispute as to whether the defendant failed to reasonably accommodate her.

The plaintiff alleges that a third PAR I position was filled on August 19, 2002, by Janice Green.  (Doc. 19 at p. 15). The defendant retorts that it could not have placed the plaintiff in this position, however, because when it was filled, the plaintiff was restricted to working only half days and to accommodate her half day restriction would have required UAHSF to create a position just for the plaintiff, which it was not required to do.

Lastly, the plaintiff alleges that a Switchboard Operator position was filled on March 11, 2002, by Virginia Andrews. (Doc. 19 at p. 15).  Andrews testified, however,  that she was hired as Switchboard Operator in August 1999.  She later cross-trained as a Medical Records Clerk but returned to the Switchboard Operator position by December 2000.  (Andrews Aff. at ¶¶ 2-4 located at document 17, tab 8 in the court's record of the case).  For whatever reason, UAHSF did not "clean up" Andrews' personnel paperwork to correctly reflect her position until March 11, 2002.  (Powell Dep. at pp. 83-84, 108-09).

Nevertheless, because the plaintiff cannot establish a prima facie case, the court need not resolve the reasonable accommodation issue.

### Retaliatory Discharge

The plaintiff's only remaining claim is one for retaliatory discharge in violation of Ala. Code § 25-5-11.1.  While the defendant argues that the plaintiff's claim is due to be dismissed because it is barred by a settlement agreement the plaintiff entered into releasing her worker's compensation claims, the court declines to determine the merits of the plaintiff's claim or the defendant's defense.  As the court finds that the plaintiff's only federal claim is due to be dismissed, it declines to maintain supplemental jurisdiction over the remaining state law claim. *See* 28 U.S.C. § 1367(c).  Additionally, the court is cognizant that the Eleventh Circuit has found that "the federal court lacks subject matter jurisdiction to entertain . . . retaliatory discharge claim[s]" when the claim is removed to federal court.  *Reed v. The Heil Co.*, 206 F.3d 1055, 1058 (11th Cir. 2000).  The Eleventh Circuit explains that this holding is necessary because a cause of action for retaliatory discharge arises under Alabama's worker's compensation laws and "28 U.S.C. § 1445(c) bars the removal of claims from state court 'arising under the workmen's compensation laws' of the forum state." *Id*.  It follows, then, that claims arising under the worker's compensation laws of Alabama are best suited for the Alabama state courts. Accordingly, the court finds that the plaintiff's claim for retaliatory discharge is due to be dismissed without prejudice to file it in state court should the plaintiff so wish.

### CONCLUSION

Premised on the foregoing, the defendants' motion for summary judgment is due to be granted.   The plaintiff's discrimination claim is due to be dismissed with prejudice and her retaliatory discharge claim is due to be dismissed without prejudice.  An order in accordance with the court's findings will be entered contemporaneously herewith.

**DONE**, this 31st day of March, 2005.

_John E. Ott_

**JOHN E. OTT**
United States Magistrate Judge